**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-4737**

_____

UNITED STATES OF AMERICA,

> Plaintiff – Appellee,

> v.

WILLIAM DAYSHAWN WILSON, a/k/a Santana, a/k/a Dayshawn,

> Defendant – Appellant.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville.  James C. Dever III, District Judge.  (4:21-cr-00053-D-1)

_____

Argued:  March 19, 2025                    Decided:  August 25, 2025

_____

Before DIAZ, Chief Judge, GREGORY, Circuit Judge, and Jasmine H. YOON, United States District Judge for the Western District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Yoon wrote the opinion, in which Chief Judge Diaz joined. Judge Gregory wrote a dissenting opinion.

_____

**ARGUED:**  Raymond Curtis Tarlton, TARLTON LAW PLLC, Raleigh, North Carolina, for Appellant.  David A. Bragdon, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**  Michael F. Easley, Jr., United States Attorney, Lucy Partain Brown, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

_____

YOON, District Judge:

After negotiating a written plea agreement, William Dayshawn Wilson pled guilty to one count of aiding and abetting possession with intent to distribute 40 grams or more of a mixture containing fentanyl.  In exchange for Wilson's guilty plea, the government agreed to stipulate to the application of certain sentencing factors in the United States Sentencing Guidelines.  As relevant to this appeal, the government stipulated to the drug weight used to calculate Wilson's base offense level and further stipulated that Wilson was a manager or supervisor of criminal activity involving five or more participants.  The government reserved the right to offer evidence and argument at sentencing and to make a sentencing recommendation.  The government ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ clarified it was not promising to seek a downward departure ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

At sentencing, the government moved for an upward departure or variance from the Guidelines range based on Wilson's criminal history, as well as a downward departure or variance ▓▓▓▓▓▓▓▓▓▓▓▓.  The district court applied both an upward departure and a downward departure and ultimately sentenced Wilson to 234 months' imprisonment.

On appeal, Wilson argues that the government twice breached its obligations in the plea agreement: first, by failing to argue for a below-Guidelines sentence ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; and second, by relying on facts that were inconsistent with the two stipulations—as to the drug weight and the role—when arguing for an upward departure or variance.  Wilson did not raise these arguments in the district court, so we review for plain error.  Finding no plain error, we affirm the district court's judgment.

2

I.

In August 2021, Wilson was indicted on a single count of aiding and abetting possession with intent to distribute 40 grams or more of a mixture containing fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. J.A. 15. A superseding indictment issued in October 2021 charged Wilson with the same count. J.A. 78.

After initially pleading not guilty, Wilson negotiated a written plea agreement with the government. In the plea agreement, the government stipulated to positions on certain sentencing factors, while clarifying that the district court was not bound by the stipulations. For one, the government agreed that the relevant drug weight under U.S.S.G. § 2D1.1 was "at least 100 kilograms but less than 400 kilograms of converted drug weight, resulting in a base offense level of 24." J.A. 204. The government further agreed that Wilson should receive an upward adjustment of three levels under U.S.S.G. § 3B1.1(b) as a "manager or supervisor[]" of criminal activity involving five or more participants. *Id.*

Under the terms of the plea agreement, the government "reserve[d] the right to make a sentencing recommendation," "to present any evidence and information" and "offer argument or rebuttal" at sentencing, and to respond to any motions or objections Wilson filed. J.A. 202–03. The agreement also specified that the government could provide the United States Probation Office with "any evidence concerning relevant conduct." J.A. 203.

The government further agreed to ████████████████████████████ ██████████████████████████████████████████████ *Id.* At the same time, though, the government clarified it was "not promising to move for departure ████ ██████████████████████████████." *Id.*

3

The district court held a change-of-plea hearing and accepted Wilson's guilty plea. J.A. 103, 116–17. To establish a factual basis for the plea, the government proffered that evidence would show Wilson directed another person to acquire fentanyl and store it in a residence in North Carolina, and that law enforcement discovered 46 grams of fentanyl when searching the residence in response to an unrelated incident. J.A. 116–17. Before the court accepted the plea, Wilson confirmed he had read and discussed the entire plea agreement with his counsel before signing it, that he understood each term therein, and that the written agreement constituted his entire agreement with the government. J.A. 111. The court and parties did not discuss the Guidelines stipulations or the government's reservations in the plea agreement, though the court did inform Wilson that it would consider "all arguments" the prosecutor and defense counsel might make at sentencing. J.A. 109.

Wilson's presentence report ("PSR") provided more extensive information about Wilson's involvement in drug trafficking, which drew from investigation reports provided to the probation officer by the government. The probation officer determined that Wilson was accountable for a total of 34 kilograms of cocaine, 8.64 kilograms of heroin, 154.29 grams of fentanyl, and 13.61 kilograms of marijuana—far more than the drug weight stipulated in the plea agreement. J.A. 216, 228. The probation officer also found that Wilson was an "organizer or leader" of the criminal activity under U.S.S.G. § 3B1.1(b), which would have warranted a four-level enhancement rather than the stipulated three-level enhancement for a "manager or supervisor." J.A. 228. Those findings, along with some additional adjustments, would have produced a total offense level of 43. Combined

4

with Wilson's criminal history category of V, that offense level would have resulted in an advisory Guidelines range of life imprisonment, reduced to the statutory maximum of 480 months. *Id.*

The probation officer next calculated the Guidelines range that corresponded to the stipulations in the plea agreement. The stipulated drug weight called for a base offense level of 24. After applying the "manager or supervisor" enhancement and other adjustments, the probation officer determined that the total offense level was 32. J.A. 227–28. Combined with Wilson's criminal history category, that offense level yielded an advisory range of 188 to 235 months. *Id.*

Wilson initially lodged several objections to the PSR. One objection asserted that the probation officer's relevant conduct summary was inconsistent with the stipulations in the plea agreement. J.A. 231–33. The probation officer declined to revise that part of the PSR, and Wilson later withdrew his objections. J.A. 156, 161–62.

Ahead of Wilson's sentencing, the government moved for an upward departure from the Guidelines range of 188 to 235 months or, alternatively, for an upward variance based on the factors in 18 U.S.C. § 3553(a). It argued for an upward departure on the ground that Wilson's criminal history category of V "substantially under-represent[ed] the seriousness of [his] criminal history and/or the likelihood [he] will commit other crimes." J.A. 121. In addition to emphasizing Wilson's criminal history, the government asserted that Wilson was "a high-ranking member of United Blood Nation in Craven County," managed several "trap houses" in the area, had "a reputation for violence which he utilized as a part of his role in this drug trafficking organization," and directed activities for the drug organization

5

by phone while he was in custody.  J.A. 125–26.  It highlighted the same facts about Wilson's criminal history and his "leadership role in th[e] drug trafficking organization" when arguing for an upward variance.  J.A. 128.  Wilson filed a sentencing memorandum in which he opposed the government's motion for an upward departure or variance and argued that the § 3553(a) factors supported a below-Guidelines sentence.  J.A. 282–90.

After Wilson filed his sentencing memorandum, the government filed a motion for a downward departure ███████████████.  J.A. 292–93.

Wilson's sentencing hearing took place on October 16, 2023.  The court first found that the applicable Guidelines range was 188 to 235 months, based on a total offense level of 32 and criminal history of V.  J.A. 162.  The government agreed but argued for an upward departure or variance on the basis that the Guidelines range was "not sufficient to capture [the] likelihood of recidivism."  J.A. 162–63.  To support that argument, it discussed Wilson's criminal history and repeated probation violations, but it also called attention to his "leadership in the gang and the orchestration that he's done."  J.A. 163–65.  The government told the court that Wilson "direct[ed] other people to be involved in firearms," was "orchestrating many different types of activities," and was "engaging other people to become criminals."  *Id.*  It further argued that Wilson posed a danger to the community because he was "running these drug houses and all of this activity and directing others with guns and drugs and huge amounts of money."  J.A. 167.  The government proposed an upward departure to a Guidelines range of 235 to 293 months and asked for a sentence "somewhere in the range of 262 months."  J.A. 166–67.

6

The district court granted the government's motion for an upward departure. J.A. 171–72. It concluded that "the proper place to go is to a total offense level of 33 and a criminal history category of VI," which corresponded with the 235-to-293-month advisory Guidelines range. *Id.* The court then granted the government's motion for a downward departure ████████████. J.A. 311.

Finally, the court heard arguments from the parties on the § 3553(a) factors. During those arguments, the government described Wilson as "a gang leader" who "was in charge of a number of stash houses" and "got other people" to "run guns" and "get large amounts of drugs for him." J.A. 176–77. It concluded by asking for a sentence of 235 months based on "all things considered." J.A. 177. Wilson asked for a sentence of no more than 235 months. J.A. 175.

After considering the § 3553(a) factors, the court imposed a sentence of 234 months' imprisonment, followed by five years of supervised release. J.A. 182. The district court entered its final judgment on November 2, 2023. J.A. 12. Wilson filed a timely notice of appeal. J.A. 12, 195. We have jurisdiction under 28 U.S.C. § 1291.

## II.

On appeal, Wilson argues that the government breached the plea agreement by failing to request a below-Guidelines sentence and by making arguments at sentencing that conflicted with the stipulations in the agreement.[1] Wilson did not raise either argument

---

[1] While Wilson waived his right to appeal his sentence, "[a] defendant's waiver of appellate rights cannot foreclose an argument that the government breached its obligations (Continued)

before the district court, so we review them for plain error. *United States v. Edgell*, 914 F.3d 281, 286–87 (4th Cir. 2019). "Plain error requires the existence of (1) an error, (2) that is plain, (3) that affects the defendant's substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Dawson*, 587 F.3d 640, 645 (4th Cir. 2009). Wilson has the burden of establishing each element of plain error. *Id.* For the reasons outlined below, we conclude that neither alleged breach satisfies this heightened standard.

## A.

We first consider whether the government plainly breached any terms of its plea agreement with Wilson.

"It is well-established that the interpretation of plea agreements is rooted in contract law, and that each party should receive the benefit of its bargain." *Id.* (quoting *United States v. Peglera*, 33 F.3d 412, 413 (4th Cir. 1991)). "Although 'we employ traditional principles of contract law as a guide in enforcing plea agreements, we nonetheless give plea agreements greater scrutiny than we would apply to a commercial contract because a defendant's fundamental and constitutional rights are implicated when he is induced to plead guilty by reason of a plea agreement.'" *United States v. Johnson*, 119 F.4th 343, 349 (4th Cir. 2024) (quoting *Edgell*, 914 F.3d at 287). When a promise made by the prosecutor is "part of the inducement or consideration" for a guilty plea, the prosecutor must fulfill

---

under [a] plea agreement." *United States v. Dawson*, 587 F.3d 640, 644 n.4 (4th Cir. 2009) (citing *United States v. Cohen*, 459 F.3d 490, 495 (4th Cir. 2006)).

that promise. *Dawson*, 587 F.3d at 645 (quoting *Santobello v. New York*, 404 U.S. 257, 262 (1971)). At the same time, "[a] central tenet of contract law is that no party is obligated to provide more than is specified in the agreement itself." *Peglera*, 33 F.3d at 413. Thus, "the government is held only to those promises that it actually made to the defendant." *Id.*

"In determining what promises the government made, we read a plea agreement's plain language in its ordinary sense." *Johnson*, 119 F.4th at 349 (quoting *United States v. Tate*, 845 F.3d 571, 575 (4th Cir. 2017)). Courts should interpret plea agreements in a manner that "gives effect to all provisions of the contract" rather than "one which renders a portion of the writing superfluous, useless, or inexplicable." *Id.* (citations omitted).

### 1.

Wilson first argues that the government breached the plea agreement by failing to ask the district court to impose a below-Guidelines sentence. He contends that the agreement required the government to request a ███████ downward departure ████████ ██████████████████████████████████, and that the government violated that obligation when it moved for both a downward departure *and* an upward departure or variance. For several reasons, we find this argument unpersuasive.

As a starting point, the plea agreement did not require the government to file a ███████ motion ██████████████████████████████████████████. In fact, the agreement says the opposite. While the government agreed to "make known to the Court at sentencing ████████████████████████████████████████████████████," the same paragraph clarifies that "the United States [was] *not* promising to move for departure ████████████████████████████████████." J.A. 203

9

(emphasis added).  The language reserving the government's "right to make a sentence recommendation" further underscores that the government did not commit to recommend a below-Guidelines sentence.  J.A. 202.  Thus, the government did more than the plea agreement required when it filed the ▮▮▮▮ motion ahead of sentencing.

Wilson next argues that the government could not, consistent with the plea agreement, move for both an upward *and* a downward departure.  This argument also finds no support in the agreement.  Although the agreement did not expressly authorize the government to move for an upward departure or variance, it did reserve the government's rights to "make a sentence recommendation," to "present any evidence and information pursuant to 18 U.S.C. § 3661," to "offer argument or rebuttal," and to "respond to any motions or objections filed by the Defendant."  J.A. 202–03.  In a recent decision, this court held that identical language in a plea agreement imposed "no limitations" on the government's ability to argue for a particular sentence.  *Johnson*, 119 F.4th at 350–51.  It also explained that a stipulation about the relevant drug weight and base offense level did not prevent the government from arguing for a sentence above the Guidelines range that resulted from that stipulation—at least where the government did not also stipulate to the applicable Guidelines range.  *Id.*  As in *Johnson*, Wilson's plea agreement likewise contained no terms that restricted the government's discretion to recommend a sentence above the Guidelines range.  *See also United States v. Batts*, 317 F. App'x 329, 330 (4th Cir. 2009) (holding that "the Government did not breach [a] plea agreement by moving for an upward departure [where] [t]he agreement contained no provision prohibiting the Government from moving for an upward departure").

10

Wilson maintains that the government "waived" its right to move for an upward departure or variance once it moved for a downward departure ██████████. But the plea agreement is silent on this issue, and the government does not waive its ability to move for an upward departure or variance "in the absence of an explicit waiver." *Johnson*, 119 F.4th at 351; *see United States v. Snow*, 234 F.3d 187, 190 (4th Cir. 2001). Wilson also argues that the government's motion for an upward departure or variance effectively nullified his ██████ motion for a downward departure because the two are mutually exclusive. But even if Wilson is correct on that point, the plea agreement did not require the government to seek a downward departure in the first place, so the government did not violate any terms of the agreement by filing both motions.

We therefore conclude that the government did not breach the plea agreement by failing to request a below-Guidelines sentence.

2.

Wilson next contends that the government plainly breached the plea agreement by relying on facts that conflicted with the Guidelines stipulations to support its argument for an upward departure or variance.[2]

---

[2] On appeal, Wilson focuses on the factual arguments the government made at sentencing. He does not argue that the government breached the plea agreement by disclosing its complete investigative files to the Probation Office. The plea agreement authorized the government to disclose "any evidence concerning relevant conduct" to the Probation Office. J.A. 203. That language permitted the government to provide information to the Probation Office about relevant conduct that went beyond the scope of the Guidelines stipulations. *See Edgell*, 914 F.3d at 287.

(Continued)

While the government has a duty to disclose relevant information at sentencing, it "may not hide behind" that duty "to advocate a position that contradicts its promises in a plea agreement." *Edgell*, 914 F.3d at 288 (quoting *United States v. Munoz*, 408 F.3d 222, 227 (5th Cir. 2005)). "Instead, the government must carefully balance its duty of candor to the sentencing court with the sometimes competing—but equally solemn—duty to honor its commitments under a plea agreement." *Id.* "[T]his balance is achieved where the government makes the necessary disclosures to the sentencing court, but nevertheless continues to advocate for acceptance of the agreement." *Id.* (cleaned up).

The parties first disagree whether the government made any sentencing arguments that were inconsistent with the stipulations about Wilson's drug conduct and role as a "manager or supervisor." Some of the government's arguments at least created tension with them. When asking for an upward departure or variance, the government did not specifically cite the larger drug amount described in the PSR. But it did claim that Wilson posed a danger to the community because he was "running these drug houses and all of this activity and directing others with guns and drugs and huge amounts of money." J.A. 167. The government did not go into more detail, but its statement arguably exceeds the

---

The government argues that Wilson waived *any* challenge related to the facts in the PSR when he withdrew his objection to the PSR's relevant conduct summary. That withdrawal would have waived any objection to the district court considering those facts, but it does not prevent Wilson from claiming that the government breached the plea agreement by making factual arguments that conflicted with the parties' stipulations. In some circumstances, the government may breach a plea agreement by making arguments based on facts that are otherwise appropriate for the court to consider at sentencing. *See Edgell*, 914 F.3d at 287–89.

scope of the stipulated drug weight, which was limited to 46 grams of fentanyl seized from a single residence.

The government also described Wilson's role in a way that suggested he was an "organizer or leader" of the drug-trafficking activity, not merely a "manager or supervisor" as stipulated. To be sure, the government did not ask the court to apply the four-level enhancement for an "organizer or leader," and it did not engage with the factors used to distinguish an "organizer or leader" from a "manager or supervisor." *See* U.S.S.G. § 3B1.1(b), comment n.4. That being said, the government made several statements that suggested Wilson played more than a managerial or supervisory role in the criminal activity. In its motion for an upward departure or variance, it emphasized Wilson's "leadership role in th[e] drug trafficking organization" and described him as "a high-ranking member of United Blood Nation in Craven County" who had continued directing criminal activity while he was in custody in 2019. J.A. 125–26, 128. At the sentencing hearing, the government similarly reminded the court of Wilson's "leadership in the gang and the orchestration that he's done," which included "directing other people to be involved in firearms," "orchestrating many different types of activities," and "engaging other people to become criminals." J.A. 164–65. And, as already noted, the government argued that Wilson posed a danger to the community because he was "running these drug houses and all of this activity and directing others with guns and drugs and huge amounts of money." J.A. 167.

Those statements—particularly the ones describing Wilson's role in directing and orchestrating the drug-trafficking activity—are more consistent with an "organizer or

13

leader" than a lower-ranking "manager or supervisor."[3] *See* U.S.S.G. § 3B1.1(b), comment

n.4 (stating that the factors considered in distinguishing a leadership and organizational

role from a managerial or supervisory role include "the exercise of decision-making

authority," "the recruitment of accomplices," "the degree of participation in planning or

organizing the offense," and "the degree of control and authority exercised over others,"

among other factors).

Even if the government made sentencing arguments based on facts that exceeded

the scope of the two stipulations, we must determine whether such arguments breached

Wilson's plea agreement. The government says they did not. It maintains that the two

stipulations merely established the parties' positions on the base offense level and the

"manager or supervisor" enhancement. In the government's view, the stipulations did not

limit the parties from making *any* factual arguments at sentencing, even arguments based

on conduct that went beyond the scope of those stipulations. The government argues that

it honored its promises in the agreement because it never asked the court to apply a different

base offense level or the "organizer or leader" enhancement.

Some terms in the plea agreement are consistent with the government's position.

As discussed above, the government expressly reserved the "right to make a sentence

recommendation," "to present any evidence and information pursuant to 18 U.S.C.

---

[3] The plea agreement stated that the stipulations would not bind the government if Wilson's "conduct prior to sentencing change[d] the circumstances with respect to any such factors." J.A. 203–04. But there is no indication that Wilson engaged in any additional drug-trafficking activity while in custody between the date of the plea agreement and his sentencing.

14

§ 3661," and "to offer argument or rebuttal" at sentencing. J.A. 202–03. Section 3661 provides that "*[n]o limitation* shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661 (emphasis added). Those provisions, especially the reference to § 3661, did not impose any restrictions on the government's ability to make factual arguments at sentencing.

On the other hand, the government's interpretation of the plea agreement risks misleading defendants and leaving the stipulations with little effect. By that interpretation, the stipulations applied only to the initial calculation of the advisory Guidelines range— they did not constrain the government from relying on any facts to argue for an upward departure or variance from that range. Although such a reading would not render the stipulations completely "useless" or "superfluous," *Johnson*, 119 F.4th at 349, as they would serve *some* purpose by factoring into the benchmark Guidelines range, the stipulations lose much of their force if the government can rely on conflicting facts to ask the court to depart upward from the Guidelines range.

While we find the government's conduct troubling, we cannot conclude that its potential breach of the plea agreement rises to the level of plain error. An error is plain when it is "clear" or "obvious under current law." *United States v. Hope*, 28 F.4th 487, 507 (4th Cir. 2022) (cleaned up); *see Puckett v. United States*, 556 U.S. 129, 135 (2009). This court has classified a breach of a plea agreement as plain error when the government's "duties pursuant to the plea agreement were sufficiently clear" and "unambiguous."

15

*Edgell*, 914 F.3d at 289. "Not all breaches [of plea agreements] will be clear or obvious. Plea agreements are not always models of draftsmanship, so the scope of the Government's commitments will on occasion be open to doubt." *Puckett*, 556 U.S. at 143.

Wilson's plea agreement did not clearly prohibit the government's conduct here. The parties agreed to terms that gave the government broad discretion to present facts at sentencing and make an appropriate sentence recommendation. The agreement did not explicitly bar the government from referring to offense conduct that exceeded the scope of the drug-weight and "manager or supervisor" stipulations. Nor did it require the government to recommend a sentence within a particular Guidelines range. The agreement therefore left some "doubt" about the extent of the government's ability to argue for an upward departure or variance based on conduct that went beyond the stipulations. *Puckett*, 556 U.S. at 143. While some of the government's arguments certainly created tension with the two stipulations, the fact that the government did not clearly abandon the stipulations also weighs against finding plain error in this case.

Wilson maintains that this court's decision in *Edgell*—which held that the government plainly erred by violating stipulations in a plea agreement—supports a finding of plain error here. In *Edgell*, the government agreed to a stipulation limiting the drug weight to an amount that corresponded to an advisory Guidelines range of 10 to 16 months. 914 F.3d at 285. It further agreed to "recommend that any sentence of incarceration imposed be at the lowest end of the applicable guideline range." *Id.* (cleaned up). At sentencing, though, the government chose not to object to the district court's decision to apply a Guidelines range of 30 to 37 months, which was based on new information showing

16

a larger drug weight. *Id.* at 286. The government did not recommend a sentence that was consistent with the stipulated drug weight and at the "lowest end" of the Guidelines range that resulted from that stipulation. *Id.* Instead, it advocated for a sentence at the low end of the higher 30–37-month range, declined to join the defendant's motion for a downward variance, and "did not otherwise encourage the court to consider in any way the factual stipulation to which it agreed in exchange for [the defendant's] guilty plea." *Id.* at 286, 288. This court held that the government "affirmatively undermined the plea agreement by requesting a sentence inconsistent with its stipulation," which denied the defendant "a central benefit of his bargain." *Id.* at 288–89.

*Edgell* is distinguishable in important respects. Unlike the plea agreement in *Edgell*, Wilson's did not require the government to recommend a sentence within the Guidelines range that corresponded to the stipulations. To the contrary, it reserved the government's rights to make a sentence recommendation and present all relevant facts at sentencing. Because the government had no obligation to recommend a particular sentence under the plea agreement, it is not clear that it "request[ed] a sentence inconsistent with its stipulation[s]" by seeking an upward departure or variance. *Id.* at 288. In other words, the scope of the government's obligations under Wilson's plea agreement is "open to doubt," *Puckett*, 556 U.S. at 143, which was not the case in *Edgell*.

In sum, neither the language of Wilson's plea agreement nor existing precedent establishes that the government's alleged breach was "clear" or "obvious under current law." *Hope*, 28 F.4th at 507 (cleaned up). We therefore find that the government did not commit plain error at Wilson's sentencing.

17

III.

For the foregoing reasons, we conclude that the government did not plainly breach the terms of its plea agreement with Wilson during sentencing.  Accordingly, we affirm the sentence imposed by the district court.

*AFFIRMED*

GREGORY, Circuit Judge:

The majority and I agree on a key point: the government's conduct in this case is "troubling." Majority Op. at 15. But I disagree with my good colleagues as to the implications of that troubling conduct. It is my view that the government's efforts to all but entirely undermine the factual stipulations it negotiated and agreed to with the defendant demands re-sentencing, even under plain error review. Thus, I respectfully dissent.

## I.

For better or worse, our criminal justice system is built on plea agreements. *See generally* Andrew Manuel Crespo, *No Justice, No Pleas: Subverting Mass Incarceration Through Defendant Collective Action*, 90 Fordham L. Rev. 1999, 2000–04 (2022). As has been the case for decades, "[t]he reality, as every experienced prosecutor and judge knows, is [that the] prosecutor must get rid of five hundred cases in a time sufficient for the trial of only one hundred. . . . If all the defendants should combine to refuse to plead guilty, and should dare to hold out, they could break down the administration of criminal justice in any state in the Union." Henry T. Lummus, *The Trial Judge* 44–46 (1937). But this system of negotiation depends on an assumption of good faith on both sides. *See United States v. Anderson*, 773 F. App'x 127, 129 (4th Cir. 2019) (per curiam) ("Plea agreements, like all contracts, contain an implied duty of good faith and fair dealing in contract performance.") (collecting cases). The entire system would crumble if criminal defendants feared that the government would end-run around these negotiated deals.

19

It is, thus, well-established that "the harm generated by allowing the government to forego its plea bargain obligations is one which cannot be tolerated." *United States v. Peglera*, 33 F.3d 412, 414 (4th Cir.1994) (Wilkinson, J.). As a result, we have adopted a rule that courts must construe any uncertainty in plea agreements against the government. This is because, as drafters of the plea agreement, the "burden [is] on the Government, not [the defendant,] to clear" up any ambiguities. *United States v. Petties*, 42 F.4th 388, 395 (4th Cir. 2022); *see also United States v. Barefoot*, 754 F.3d 226, 246 (4th Cir. 2014) (explaining that ambiguities in plea agreement are "construed against the government as its drafter"); *United States v. Wood*, 378 F.3d 342, 348 (4th Cir. 2004) (explaining that this Court "hold[s] the Government to a greater degree of responsibility than the defendant (or possibly than would be either of the parties to commercial contracts) for imprecisions or ambiguities in plea agreements.") (cleaned up). Despite this legal burden and its obligation to negotiate and execute plea agreements in good faith, the government here, at best, failed to clear up ambiguity in a plea agreement that resulted in an agreement too good to be true––because it was.

Like the majority, I agree that this case is subject to plain error review. This analysis has four requirements: "(1) an error, (2) that is plain, (3) that affects the defendant's substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Dawson*, 587 F.3d 640, 648 (4th Cir. 2009). But, now breaking from the majority, I would find that Wilson has demonstrated all four elements and thus hold that the district court plainly erred by considering facts at sentencing that conflicted with the plea agreement's factual stipulations.

20

II.

As the majority explains, Wilson and the government agreed to two key factual stipulations in exchange for his guilty plea:  one as to the relevant drug weight for sentencing, and the other to Wilson's role as a "manager or supervisor" in the offense as opposed to a "leader."  J.A. 204 [SEALED].  Using a loophole in the plea agreement, the government nonetheless argued at sentencing that the higher-than-stipulated conduct bore on Wilson's likelihood of recidivism and thus merited an upward departure.  J.A. 121–28.

The majority and I agree that the government made several statements that were in tension with their factual stipulations.  For example, the government argued that Wilson moved a much higher quantity of drugs than was stipulated, stating that he "posed a danger to the community because he was 'running these drug houses and all of this activity and directing others with guns and drugs and huge amounts of money.'"  Majority Op. at 13 (citing J.A. 167).  It also contradicted the "manager or supervisor" stipulation by emphasizing Wilson's "leadership role in th[e] drug trafficking organization" and describing him as "'a high-ranking member of United Blood Nation in Craven County' who had continued directing criminal activity while he was in custody in 2019."  *Id*. at 14 (quoting J.A. 125–26, 128).  I agree with the majority that the government's statements here are incredibly problematic, as "the stipulations lose much of their force if the government can rely on conflicting facts to ask the court to depart upward from the Guidelines range."  Majority Op. at 15.

However, here is where the majority and I diverge.  While it is true that the plea agreement cannot be said to explicitly bar the government's conduct, read as a whole, the

21

parties' agreement to fact-based stipulated offense levels clearly evinces their intention to prevent the government from contradicting the stipulations in the broader sentencing process. To me, our caselaw compels a finding that the government's actions here constitute a breach of the plea agreement. *See, e.g.*, *Petties*, 42 F.4th at 395 (finding the government to have breached a plea agreement despite potential ambiguity because of the government's burden to "clear it up."). Any interpretation otherwise—that is, that the agreement allowed the government to directly contradict the stipulations if it so pleased— is unreasonable as a matter of contract interpretation. Just because there is some "open[ness] to doubt" as to the exact requirements of an agreement does not immunize the government from allegations of breach solely based on counsel's failure to properly object. Majority Op. at 17 (citing *Puckett v. United States*, 556 U.S. 129, 143 (2009)). If this were the law, it would entirely flip our precedent of requiring ambiguity to be read in a defendant's favor on its head. Thus, unlike the majority, I would find that the second element of the plain error analysis was met.

Turning to the third plain error requirement, the impact on substantial rights, "[a] breach of a plea agreement affects a defendant's substantial rights only if it prejudices the defendant." *United States v. Edgell*, 914 F.3d 281, 290 (4th Cir. 2019) (citing *Puckett*, 556 U.S. at 135). While true that "the sentencing court was not bound by the parties' stipulation," *id*. at 290, "the court may well have taken the government's position into account" with regards to an upward departure if not for the government's breach, *id*; *see also United States v. Navarro*, 817 F.3d 494, 501 (7th Cir. 2016) ("[C]ases where we have found that the defendant failed to prove the prejudice prong are ones in which the record

22

compellingly reflects the sentencing court was not influenced by the government's recommendation."). While difficult to prove a counterfactual, I see no indication from the record that the district court would have departed upward over the government's objection. Thus, I think it would be beyond dispute that the government's breach affected Wilson's substantial rights.

Finally, turning to the last plain error requirement, there can be no question that the government's breach seriously impugned the "fairness, integrity, or public reputation of judicial proceedings." *Puckett*, 556 U.S. at 135 (cleaned up). As we have recognized, "the Government's breach of a plea agreement constitutes a particularly egregious error that, *in the absence of strong countervailing factors*, seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Edgell*, 914 F.3d at 291 (emphasis in original) (quoting *United States v. Kirkland*, 851 F.3d 499, 505 (5th Cir. 2017)). The Supreme Court requires us to apply this prong of plain error on a "case-specific and fact-intensive basis," *id*. (quoting *Puckett*, 556 U.S. at 142–43), which, doing so, leads me to my conclusion that there are no countervailing factors to rebut that grave error.

In my view, the facts of the case, especially Wilson's eleventh-hour change of counsel, indicate a lack of fairness and integrity in these proceedings. Several months after Wilson entered into the plea agreement but prior to sentencing, Wilson requested new counsel, explaining to the court that he believed his first lawyer provided him with insufficient representation. *See* J.A. 139–40 (explaining that his counsel, after not coming to visit him, eventually met with Wilson and determined that "he can't help" him, leaving Wilson to try to find a lawyer who could). With only a short while to gain familiarity with

23

Wilson's case, Wilson's new counsel failed to preserve breach of the stipulations for appeal. Factored into the broader analysis, what we are left with is a breached plea agreement, violated shortly after a change in counsel, that counsel then failed to preserve for appeal. Given the fundamental rights at stake, the finding of breach, and these individualized circumstances, I would find that the government's breach here meets all of the requirements of plain error.

### III.

It seems likely that this case would have come out differently had Wilson's trial counsel preserved this argument for appeal. And I again wish to note that the differences between my view and that of the majority are narrow. However, it is this narrow disagreement that warrants vacatur and remand for resentencing. I respectfully dissent.

24